NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION 112, AFL–CIO, and Fischbach/Lord Electric Company, Respondents.

No. 84–7556.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 5, 1985.

Decided Sept. 4, 1987.

Kenneth J. Pederson and David E. Williams, Richland, Wash., Gary P. Scholick and Richard N. Hill, San Francisco, Cal., for respondents.

Kenneth Hipp and Collis Suzanne Stocking, Washington, D.C., for petitioner.

Before HUG, FARRIS and BOOCHEVER, Circuit Judges.

HUG, Circuit Judge:

The National Labor Relations Board (the "Board") applies for enforcement of its order finding that the International Brotherhood of Electrical Workers ("Union"), Local Union 112 ("Local 112"), and Fischbach/Lord Electric Company (the "Company") engaged in discriminatory

practices against non-local members of the Union.

The Board found that the Union had discriminated against four nonmembers of Local 112 in hiring hall practices in violation of sections 8(b)(2) and 8(b)(1)(A) of the National Labor Relations Act ("NLRA"). The Board had issued an order that Local 112 cease and desist from such practices and make the four employees whole for losses suffered as a result of those practices. The Board also found that Local 112 and the Company acted in concert and discriminated against nonmembers of Local 112 in firing one employee and laying off 38 other employees in violation of sections 8(b)(2) and 8(b)(1)(A) of the NLRA. The Board issued an order that the Company and Local 112 cease and desist from such practices and that the 39 employees be made whole for losses suffered from those violations.

The issue with regard to the hiring hall discrimination is whether substantial evidence supports the finding of the Board that Local 112 discriminated against the four nonmembers in hiring hall referrals to Company jobs and wrongfully precluded them from inspecting the dispatch register. The issues relating to the layoffs of the 39 employees are (1) whether there is substantial evidence to support the finding of the Board; (2) whether the six-month limitation period for filing an unfair labor practice precluded the claims as to some employees; and (3) whether the complaint against the Union adequately identified the employees against whom it allegedly discriminated.

Our standard of review requires us to enforce the Board's order if the Board correctly applied the law and its findings are supported by substantial evidence in the record viewed as a whole. *Carpenters Union Local 25 v. N.L.R.B.*, 769 F.2d 574, 579 (9th Cir.1985). In this case, the Board attached the findings of the Administrative Law Judge ("ALJ") and adopted them with a minor modification that concerned two of the four employees involved in the hiring hall complaint. "We give special weight to the ALJ's credibility determinations when conflicting evidence is presented. The

Board's findings on issues of credibility are not to be disturbed unless a clear preponderance of all the evidence convinces us that the findings are incorrect." *Id.*

## I.

### HIRING HALL PRACTICE

The Washington Public Power Supply System ("WPPSS") is a consortium of power companies which, during the 1970's, was engaged in the construction of five nuclear plants. The Company was an electrical contractor at the WPPSS Nuclear Power Plant #2.

The Union and the Company operated under a collective bargaining agreement between the Union and a multiemployer association, of which the Company was a member. Under the agreement, the Union was required to operate an exclusive hiring hall, from which prospective employees would be referred to member employers. The agreement set forth a system to determine employee referral priority. Pursuant to this system, the Union maintained registers known as "out-of-work" lists, which listed employees in chronological order as of the dates they registered their availability for employment. When an employer requested a specified number of applicants, the Union would refer employees in the order of their place on the out-of-work list.

■ The Board found that Local 112 refused to refer four applicants from the hiring hall because of their nonmembership in Local 112 in violation of sections 8(b)(2) and 8(b)(1)(A) of the NLRA. It is clear that when a labor organization operates an exclusive hiring hall, it must refer applicants in conformity with the procedures set forth in the collective bargaining agreement, without regard to union affiliation. *N.L.R.B. v. International Ass'n of Bridge, Etc.*, 600 F.2d 770, 777 (9th Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980). Local 112 does not dispute this, but claims that there were legitimate explanations for its conduct.

■ Michael June and Jimmy Scott were registered with the hiring hall, but were not members of Local 112. The Board

found that June had been bypassed on at least fourteen occasions and that Scott had been bypassed on at least eight occasions.

The only explanation offered by Local 112 for these referral bypasses is that, because of the precipitous change in working conditions and the resultant layoffs, there was a massive increase in hiring hall registrants, thereby effecting inadvertent referral errors. The Board did not accept this explanation and found that mere inadvertent error could not explain the great number of occasions that both persons were bypassed. There was substantial evidence in support of the Board's finding that the bypassing of June and Scott was the result of Union discrimination.

■ Robert Knapp and Tom McKenzie were also registered with the hiring hall, but were not members of Local 112. McKenzie was bypassed for dispatch on at least nine separate occasions, while Knapp was bypassed on four occasions. The Union claims that Knapp and McKenzie were bypassed because neither of them possessed a Washington electrician's certificate of competency. According to Walter Marlatt, the hiring hall dispatcher, there was an understanding between the Union and employers that the Union would dispatch only licensed electricians. The ALJ found in favor of the Union on this issue. This is the one area in which the Board did not adopt the ALJ's findings.

The Board found that Marlatt's testimony with respect to an understanding was vague and, therefore, not credible. Further, the Union's explanation was belied by its own failure to abide by such an understanding. During March, April, and May, Marlatt dispatched McKenzie despite the fact that McKenzie was not certified. After being previously bypassed, Knapp, still uncertified, was dispatched on May 19. The Board's finding that license requirements were not factors in the bypassing of Knapp and McKenzie was supported by substantial evidence.

■ A union's duty of fair representation requires it to permit hiring hall applicants to inspect dispatch records unless such inspection is shown to be "burden-some" or the records contain "truly confidential material." *Bartenders' Union, Local 165*, 261 N.L.R.B. 420, 423 (1982). In the present case, the Board found that the Union unlawfully denied applicants a reasonable opportunity to inspect one of the dispatch registers.

The Union concedes that it refused to permit applicants to examine a dispatch book. Marlatt testified that if anyone requested information, either he or his secretary would inspect the books for them. The purported reason for refusing access to the dispatch book was because it was, according to Marlatt, "pretty tattered." After examining the dispatch book, the Board concluded that "it did not appear in such a distressed condition so as to excuse the burden placed upon the [Union] by dint of its duty of fair representation." The Board reasonably concluded that permitting inspection of the dispatch book would not have been unduly burdensome.

## II.

### LAYOFFS

We next turn to the claim against the Company and Local 112 that they acted in concert to discriminate against nonmembers of Local 112 in laying them off contrary to their wishes. The Company and Local 112 each raise procedural claims, which we consider first.

### A. BAR OF SECTION 10(b) SIX–MONTH LIMITATION PERIOD.

■ Section 10(b) of the NLRA establishes a six-month statute of limitations for the filing of an unfair labor practice charge. The limitation period does not begin to run until the party filing the charge receives actual notice that an unfair labor practice has occurred. *American Distributing Co., Inc. v. N.L.R.B.*, 715 F.2d 446, 452 (9th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984). We review the Board's determination of actual notice under the substantial evidence standard. *Id.*

■ The unfair labor practice charges were filed on December 2, 1982. According to the Company, the claims of the 22 laid-off workers who received Reduction of Force ("ROF") cards between May 19 and June 1, 1982 are time-barred. However, notice of the intention to commit an unfair labor practice does not trigger section 10(b). *Id.* The Board reasonably concluded that the distribution and execution of the ROF cards did not provide unequivocal notice to the workers that their statutory rights were being violated. In *N.L.R.B. v. Babcock and Wilcox Co.*, 697 F.2d 724 (6th Cir.1983), the employer claimed that the limitations period began on the date the employee was suspended rather than the date of discharge. The court rejected this argument, stating that the "suspension was neither a discharge nor a final decision by the Company of any kind; it was merely a tentative first step by the Company toward imposing discipline upon [the employee]." *Id.* at 727. In the present case, it was not inevitable that, at the time they executed the ROF cards, the workers would be laid off. Therefore, the Board reasonably concluded that the workers did not receive notice of an unfair labor practice until the dates of their respective layoffs, which ranged from between June 4 and June 11, 1982.

## B. FAILURE OF COMPLAINT TO IDENTIFY TRAVELERS.

■ The Union claims that the amended complaint issued against it violated due process because it did not identify the alleged discriminatees by name. Actions before the Board are not subject to technical pleading requirements that govern private lawsuits. *National Maritime Union of America v. N.L.R.B.*, 683 F.2d 305, 307–08 (9th Cir.1982). Even when the complaint is devoid of notice of the unfair labor practice, due process is satisfied by full litigation of the issues. *Id.* The complaint did state that the Union caused the Company to engage in discrimination against "travelers." In addition, the Union did receive a copy of the complaint issued against the Company that identified the travelers by name. The Union received the complaint against the Company only five days before the hearing. However, the Union received a continuance for the hearing and was able to obtain affidavits of disclaimer from 21 of the alleged discriminatees. Under these circumstances, we conclude that, consistent with the requirements of due process, the Union was given a satisfactory opportunity to fully litigate the issues.

## C. REDUCTION OF FORCE CARDS.

WPPSS ran into serious financial difficulties and it became apparent that several of their five nuclear power plant projects would be shut down, resulting in a severe reduction in the work force required. Under International Brotherhood of Electrical Workers ("IBEW") tradition, when employment opportunities decline and the employment of local workers is jeopardized, the IBEW workers who are not local (known as "travelers") are supposed to move on and leave the employment opportunities for the local workers. In this case, such a tradition would work to the benefit of the members of Local 112. The Company was concerned that there not be a mass exodus of traveler employees, as had occurred on a previous occasion.

There were also some concerns of the travelers in carrying out this tradition. If an employee voluntarily quit his job, or was fired for cause, he was not entitled to unemployment compensation. However, it was thought that if the employee was terminated because of a reduction of force caused by the lack of work, then he would be entitled to unemployment compensation.

Local 112 and the Company contended that they knew there would be a necessity to lay off a large number of electrical workers in the near future, and that they desired to accommodate those travelers who wished to abide by the union tradition voluntarily when the reduction of force became necessary, but who did not wish to quit and thus lose their unemployment compensation. The position of the Company and Local 112 is that they arrived at an arrangement whereby the Company would distribute cards to the travelers, which

they could sign, indicating that they were willing to be laid off when the reduction of force so required. Thus, when the reduction of force occurred and they were terminated, they would still be entitled to their unemployment compensation.[1]

It is obvious that if the travelers were coerced into signing these cards under threat of being fired and thus losing their unemployment compensation, this would be unlawful discrimination on the basis of union membership and would constitute an unfair labor practice. On the other hand, if a traveler voluntarily signed the card, or otherwise made clear that he was willing to be laid off to honor the union tradition, then this would not constitute an unfair labor practice. It would, as a matter of fact, be a fair and considerate action on the part of the workers who did not have the local ties and roots in the area to assist co-workers who would suffer considerable hardship by being uprooted and having to move on.

The Board, adopting findings by the ALJ, concluded that the Company acceded to a demand or request of Local 112 and coerced the travelers to sign the cards, thus volunteering to be laid off when the reduction of force occurred.

The parties' characterizations of the facts differ. The Company and the Union rely largely on construction superintendent Koontz's version of the events in question, which is as follows: By the beginning of May, he realized that a declining workload would require a reduction of force. Koontz began receiving inquiries from travelers as to whether he was planning a reduction of force.

On May 3, Koontz discussed the workload decline with Larry Caprai, the Local 112 business agent. Caprai informed Koontz that many employees were concerned about whether there was going to be a reduction of force, and how a reduction of force would be implemented. As a result of this conversation, Koontz spoke to his immediate supervisor, Chuck Peckham, concerning the need for a reduction of

force and said that "the people in the field that were talking about leaving were probably mostly travelers." The Company's management informed Koontz that a voluntary quit would be the only acceptable procedure for any employee's request to leave the job if it was not because of a reduction of force due to lack of work.

After laying off 59 electricians on May 7, Koontz was informed by a union official—perhaps Caprai—that more employees were interested in being laid off pursuant to a reduction of force. However, at that time, there was no lack of work to justify a force reduction. To accommodate these requests, and recognizing that there would be requirements for a reduction of force in the future, Koontz devised a plan to distribute cards to the employees whereby they could indicate their willingness to be laid off when a reduction of force was required.

Koontz stated that it was his desire to avoid a situation similar to that which had occurred in 1980. Then, due to a strike in the construction industry, he had decided it was necessary to implement a layoff, and did so by laying off both travelers and Local 112 members in the order of seniority, as required by the union contract. In protest of the fact that some local members were laid off while travelers remained working, the union members of Local 112 engaged in a work stoppage against the Company and the remaining traveler electricians quit en masse.

Thus, in an effort to avert a repetition of this problem, Koontz had the ROF cards distributed to the day shift employees. The ROF cards stated:

"I _____ wish an ROF at your earliest possible convenience."

Eventually, 38 travelers were laid off, 24 of whom had received ROF cards.

The general counsel's version of the facts is as follows: At the May 3 meeting between Koontz and Caprai, Caprai requested Koontz to terminate the traveler electricians. Koontz acceded to this request, and the distribution of the ROF

---

1. We make no determination as to whether this arrangement would have qualified the employ-

ees so terminated for unemployment compensation under Washington law.

cards was to effectuate the replacement of travelers with Local 112 members.

■ A labor organization violates sections 8(b)(2) and 8(b)(1)(A) of the NLRA when it causes, or attempts to cause, an employer to discriminate against an employee because of his nonmembership in a labor organization. *N.L.R.B. v. Wismer & Becker, Contracting Engineers*, 603 F.2d 1383, 1387 (9th Cir.1979). The Board found that, at the May 3 meeting between Koontz and Caprai, the Union sought the Company's cooperation in coercing the travelers to leave their employment against their will and replacing them with Local 112 members.

The primary evidence concerning the purpose of the May 3 meeting was Koontz's testimony and his May 3 construction diary entry. Koontz's testimony, as described above, would require a finding that there was no intent to coerce the travelers to leave their jobs. However, the Board did not credit Koontz's testimony. Therefore, the key evidence relied upon by the Board was the May 3 entry in Koontz's construction diary, which stated:

> The WPPSS Board of Directors decided on Friday to mothball Unit # 1 from 2 to 5 years. This will cause a great shake-up in the craft personnel. *Larry Caprai was in today to discuss with me a way to maneuver this change-over, stating he would like to work with us.* Chuck talked with Mr. Davidson ... and felt that a quit would be the cleanest way.

(Emphasis supplied.)

The Board found that a plain reading of the phrase "maneuver this change-over" referred to a method of coercing the travelers to leave and replacing them with Local 112 members. Certainly a plain reading of that innocuous diary entry does not indicate any intent to coerce the travelers to leave. The Board relied upon the surrounding circumstances to impart this meaning to the diary. The Board stressed a Union newsletter that stated "we do have a few travelers working who refuse to leave and make room for local members." The Board acknowledged that there was a strong and honored tradition of the International Brotherhood of Electrical Workers that the travelers should give way to the local union members. It then comes as no surprise that this was called to the attention of the IBEW members, orally and in union publications. This, without more, would not amount to coercion. Moreover, the Company's willingness to cooperate with the Union in implementing this tradition and seeking to avoid loss of unemployment benefits in the process would not constitute coercion.

The ROF cards were distributed by Koontz through the Company's organizational structure at the jobsite. Koontz was the construction superintendent to whom three field superintendents reported. Under each field superintendent were general foremen, and beneath them were foremen, and then crew members. There is evidence that there was coercion by some of the individual supervisors in distributing and getting signatures on the ROF cards. With regard to those persons who testified that they were coerced, there is clearly substantial evidence to sustain the finding of an unfair labor practice. However, it is not sound to conclude from that evidence that all of the traveler employees named in the complaint were coerced into signing the ROF cards or were terminated involuntarily in a discriminatory manner. Not only is this inference directly refuted by the specific statements of the travelers themselves, but there is a distinct lack of evidence that the isolated, coercive actions of some of the supervisory personnel were planned or condoned by the Company or Local 112.

■ There was substantial evidence that four travelers on the day shift, Filardi, Dittman, Serra, and Norstebon, were coerced by their foremen into signing ROF cards, and that Michael Kelly, who refused to sign a card, was fired by his foreman for the sham reason that he left his job early for lunch. Thus, the finding that the Company had engaged in the charged discriminatory practices toward them must be sustained. However, day shift travelers Freed, Parks, Sanderson,

and Truger testified that they voluntarily signed the ROF cards and that, in accordance with IBEW tradition, they wished to make room for local union members. Their testimony was not contradicted, yet the Board found that their discharge was discriminatory and an unfair labor practice.

The Board concluded that, given the atmosphere of coercion, "it strains credulity to believe that any card signer could be unaware and, therefore, uninfluenced by such." While there was evidence of coercion in specific instances, it was limited. The only evidence of a general coercive atmosphere was the testimony of the four travelers who stated that they were coerced into signing ROF cards, the discharge of Kelly, and the testimony of traveler James Mercure, who stated that he signed an ROF card because of unidentified rumors that he would be fired anyway. Weighed against this evidence was the uncontroverted fact that there was an IBEW tradition that travelers would quit their jobs to make room for local union members when the availability of work slackened and that many travelers specifically requested to be laid off when there was a reduction of force.

We cannot uphold the Board's conclusion that, despite direct, credited evidence that Freed, Parks, Sanderson, and Truger voluntarily sought ROF's, they were nevertheless influenced by an atmosphere of coercion. This finding amounts to little more than speculation. Four foremen and four general foremen presented uncontradicted testimony that ten of the other named day shift travelers were not pressured or coerced into signing the ROF cards and did so voluntarily in recognition of the IBEW tradition. Absent contrary evidence, and in the face of this direct evidence that there was no coercion, it is also sheer speculation that these ten travelers were coerced, or that other travelers on the day shift about whom no testimony was given, were coerced into signing the ROF cards.

However, the Board held that, assuming *arguendo* that some of the travelers voluntarily signed ROF's, the Company and the Union were still liable as a matter of law.

The Board analogized the travelers' consent to sign the ROF cards to so-called "yellow dog contracts," in which an employee promises to terminate employment if he becomes a member of a labor union. The analogy is inapt. A "yellow dog contract" conditioned continued employment on the employee's agreement to refrain from engaging in protected activity, and is therefore specifically prohibited by the NLRA. *See* 29 U.S.C. § 103 (1982). Here, except in those instances where the signing was coerced and involuntary, the employee simply was requesting voluntarily to be among those laid off when a reduction of force was required. It was not an agreement to refrain from engaging in a protected activity.

## D. SWING SHIFT EMPLOYEES.

Fifteen travelers who worked on the swing shift were laid off. The ALJ noted "Counsel for the General Counsel offered no evidence, either in their case-in-chief or on rebuttal, regarding the layoffs of the swing shift personnel." Unlike the day shift employees, these travelers did not sign ROF cards. General foreman Donald Day testified that the cards were given to him by the field superintendent, but he thought it unnecessary to distribute them because he knew which of the employees desired an ROF. Day testified in some detail about each of the 15 travelers who were laid off and the general tenor of the conversation with each of them. Thirteen of them had approached him personally and asked to be laid off when there was an ROF. One employee, Smokey Stover, had made his desires to be laid off known to Day's superintendent. Stover was one of the employees that filed an affidavit to be removed from the action. Day testified that another employee, Chong Phil Yun, was laid off because his classification required it under the layoff provisions of the collective bargaining agreement.

Thus, Day's testimony was that 14 of the 15 employees were laid off because they were travelers who requested it when a future ROF occurred and that one was laid off under the terms of the collective bargaining agreement. In response to ques-

tioning by the ALJ, Day summarized the reason for the layoff of the 14 swing shift travelers as being their desire to follow the "code of the traveler." He stated:

> Their expression [was] that we had a few local people on the crew, and their concern was that one of them might be selected to stay and a local man would be laid off, and that is not generally speaking, the code of the traveler, myself included when—we prefer if we had to go into an area we work and when that work winds down, we pick up our duffel and head out to the next job. And that was precisely what these fellows were indicating to me.

> Judge: That they didn't want to be kept on the job if the layoffs were going to occur?

> Day: And if it would affect some local people.

> Judge: Did any of them tell you that?

> Day: Absolutely. This is what I'm trying to indicate on these questions.

The crucial question is whether these workers desired to be laid off to honor the "code of the traveler" as opposed to being involuntarily laid off in a discriminatory manner. There was no testimony or affidavit from any of the workers that they were coerced in any way or that Day's testimony concerning their requests to be laid off was inaccurate. There was no evidence that any of them contended that they were entitled to back pay or reinstatement. In fact, five of the fifteen workers submitted affidavits, which the ALJ improperly excluded from evidence, in which each stated that he was laid off pursuant to his request for an ROF.

Thus, the only evidence produced with regard to these fifteen swing shift employees is that fourteen of them requested an ROF, and that the fifteenth worker was laid off because of his classification under the collective bargaining agreement.

The ALJ stated:

> Given my belief that Respondent Employer previously had committed itself to replacing its travelers, at the behest of Respondent Union, with members of the latter, the foregoing factors, when considered along with my reservations as to his demeanor, convince me that Donald Day was being less than candid during his testimony and that the swing shift travelers were laid off on June 28 simply because they were travelers. Finally, assuming *arguendo* that each of the laid off travelers had requested to be included in a future ROF, and I am not certain that such, in fact, occurred, that is not an important consideration as to legality of the layoffs inasmuch as, unlike for those laid off on June 4 and June 11, the "requests" were not the alleged bases given for the layoffs. Rather, Day, on behalf of Respondent Employer, asserted an uncorroborated economic justification for the entire layoff, which defense, despite being uncontroverted by the General Counsel, does not, I find, retain viability under close scrutiny.

■ The evidence simply does not support such a finding. We have earlier discussed the reasons why the findings concerning the overall conclusion that the Union and Koontz had conspired to discriminate against the travelers were not supported by the evidence. With regard to Day's credibility, the ALJ found him "less than candid"; he does not discredit Day's detailed testimony as to each worker's request for an ROF. Indeed, it is difficult to see how one could support a finding that this detailed testimony about each worker was a complete fabrication without any contrary evidence whatsoever. Furthermore, the ALJ does not ground his conclusion on a credibility finding. The ALJ, instead, states that even assuming *arguendo* that each of the laid-off employees had requested to be laid off in a future ROF, this is not an important consideration as to the legality of the layoffs. This is the root of the ALJ's error. Surely an employer cannot be held to have discriminated against a worker in laying him off when complying with that worker's request to be laid off. It is true that these workers were laid off because they were travelers, as the ALJ found, but the only evidence reveals that they were laid off because they were

travelers who *requested to be laid off* to honor the "code of the travelers."

The ALJ emphasized that Day had asserted an uncorroborated economic justification for the entire layoff. A careful reading of the transcript reveals that it was Day's testimony from the beginning that the crucial element in the layoffs was the workers' request for an ROF. It was the ALJ's vigorous cross-examination that first raised the point that part of the reason for the layoff was Day's belief that the workers would be laid off anyway, because the swing shift was being terminated and that there was no room on the day shift. The ALJ concluded that there was room on the day shift and thus discredited Day's testimony. First, it should be noted that Day did not claim that he had personal knowledge concerning whether there were positions available in the day shift to accommodate transferees. Rather, he testified that because "the job was cutting back," he *presumed* that there was no day shift work available.[2]

More significantly, however, Day's testimony was that this was not a situation in which workers were laid off against their will instead of being transferred to the day shift when the swing shift was terminated. His testimony was that the workers wanted to be laid off when there was justification for an ROF and the termination of the swing shift provided that justification. Day repeatedly testified that the employees' requests for ROF's were critical in his decision to lay off the travelers.[3] The ALJ failed to consider employee requests as a basis for the layoffs, despite the fact that the central importance of these requests was squarely established in the record based on Day's testimony.

Further, the ALJ did not consider other evidence which corroborated Day's explanation for the swing shift layoffs. As noted above, the ALJ improperly excluded from evidence 21 affidavits, executed by travelers, each of whom stated that the affiant was laid off pursuant to his request for an ROF. Among the affiants were five swing shift employees, Harold Albert, Kenneth Yost, Thomas Bauman, Barry Engleman, and Gerald Stover. If credited, these affidavits directly support Day's testimony concerning employee requests for ROF's. In addition, the ALJ disregarded Koontz's May 26 diary entry, which stated:

> Peter Burggraff [the swing shift field superintendent] had a JWW (Scott Gossard) that wanted an ROF and I discussed it with him. He said a lot of them want ROF's and I made the stand that I wasn't going to bother that swing shift until we were done.

Again, this evidence supported Koontz's explanation of the swing shift layoffs. Finally, we emphasize that there was no evidence in the record establishing specific instances of coercion of swing shift travelers.

The only evidence before the ALJ was the detailed account of the voluntary requests for ROF's by fourteen of the fifteen employees and that they were laid off pursuant to those requests. The fifteenth was laid off according to the collective bargaining agreement because of his classification. This evidence was buttressed by the affidavits of five of the fifteen who confirmed that they voluntarily requested ROF's and

---

**2.** Day testified as follows:

JUDGE: Would it have been within the realm of possibility that if some of these travelers had not requested ROF's, that some, if not all of them would have been transferred to day shift.

DAY: Well, this is a bit out of my jurisdiction because *I wasn't running the job and I couldn't tell you whether there was work, sir, for a crew. I would presume that there was not work in the sense that the job was cutting back.* They laid off day shift as well as swing shift.

(Emphasis supplied.)

**3.** For example, Day testified as follows:

JUDGE: [D]id these requests to be laid off make any difference in the fact that these people were laid off?

DAY: Did these requests make any difference? As far as I'm concerned it made a great deal of difference.

JUDGE: You just said they would have been laid off anyway. How did it make any difference?

DAY: When I terminate people there's three or four things I consider. I consider their personal preference, I consider their proficiency, and I consider their personalities.... *And in this case, I relied on their preferences.*

(Emphasis supplied.)

the May 26 diary entry of Koontz that a lot of the swing shift employees wanted ROF's. There was no evidence contradicting the specific testimony concerning the voluntary requests of the fourteen workers or the collective bargaining classification of the fifteenth, or any evidence of coercion.

Given this state of the evidence, we conclude that the ALJ's findings concerning the swing shift employees, which were adopted by the Board, were not supported by substantial evidence.

### E. SUMMARY CONCERNING LAY-OFFS

It is apparent from the evidence that the WPPSS projects were drastically curtailing employment because of the discontinuance of several of the nuclear sites. This meant that the need for electrical workers would be greatly reduced. There is a strong tradition of the IBEW that when work slows, travelers will depart and leave the work to the local union members. The strength of that tradition is apparent from the experience in 1980, when layoffs were being made strictly in accordance with seniority; the result was that the local union members objected and the travelers quit en masse.

Construction superintendent Koontz was faced with the problem of somehow avoiding a similar disaster. Obviously, it would be discriminatory, and an unfair labor practice, to lay off only travelers and keep the Local 112 workers in the absence of a request by the travelers. On the other hand, if the travelers wanted to be the first to be laid off in the event of a reduction of force, there would be nothing wrong with honoring that request.

The procedure developed by Koontz was not unreasonable in light of the fact that it had been reported to him that many travelers wanted to be laid off if there was a reduction of force. There is no indication that Koontz or the Local 112 agent, Caprai, intended that the travelers be coerced into signing the ROF cards. In the implementation of the plan, there was evidence of coercion of only five specific persons, Filardi, Dittman, Serra, Norstebon, and Kelly. It is not reasonable to generalize from this evidence that the remainder of the 39 employees were similarly coerced, including the 4 who testified that they were not coerced, and the 21 who provided affidavits that they were not coerced and wished to have their names removed from the complaint. The findings of the ALJ, adopted by the Board, as to the remainder of the 39 employees on the day shift and swing shift, are not supported by substantial evidence.

### III.

### CONCLUSION

The Board's finding that the Union violated section 8(b)(1)(A) and 8(b)(2) of the NLRA for discrimination in dispatch decisions and failure to provide access to the dispatch register is affirmed. We also affirm the findings that the Company discriminated against Filardi, Dittman, Serra, Norstebon, and Kelly in violation of section 8(a)(1) and 8(a)(3) of the NLRA. The remainder of the decision of the Board is reversed, and the case is remanded for further action by the Board in accordance with this opinion. Each party shall bear its own costs.

AFFIRMED in part, REVERSED in part, and REMANDED.