NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL
UNION 112, AFL–CIO, Respondent.

No. 91–70326.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 6, 1992.

Decided May 10, 1993.

Magdalena Revuelta, N.L.R.B., Washington, DC, for petitioner.

Alex J. Skalbania, Critchlow, Williams, Schuster, Malone & Skalbania, Richland, WA, for respondent.

Before HUG, FLETCHER and BRUNETTI, Circuit Judges.

PER CURIAM:

The National Labor Relations Board (the "Board") applies for enforcement of its second supplemental decision and order issued against the International Brotherhood of Electrical Workers, Local 112, AFL–CIO (the "Union"). The Board's order requires the Union to pay four journeymen electricians the sum of $241,830.15, to compensate them for losses of pay suffered because of the Union's discrimination against them in hiring hall dispatch decisions. We affirm.

## Facts and Proceedings

The Union is located in the Tri–Cities area of Washington state (Richland, Kennewick, and Pasco). On May 23, 1984, the Board issued its decision and order in *Fischbach/Lord Electric Co.*, 290 N.L.R.B. 856 (1983), finding that the Union had discriminated against four nonmembers of Local 112 in hiring hall dispatch decisions in violation of §§ .8(b)(2) and 8(b)(1)(A) of the National Labor Relations Act (the "Act"). The Board's order required the Union to make the four discriminatees whole for any loss of pay suffered as a result of those practices. We affirmed the Board's findings in *N.L.R.B. v. International Bhd. of Elec. Workers, Local 112*, 827 F.2d 530 (9th Cir.1987), and entered a judgment enforcing the Board's order.

Because the parties were unable to agree upon the amount of back pay owed by the Union to the discriminatees, the Board instituted a backpay proceeding pursuant to 29 C.F.R. § 102.52 to determine the backpay due. The Board's Regional Director issued an amended backpay specification on May 24, 1988 alleging that the Union owed the discriminatees a total of $241,830.15. The Union filed an answer to the amended backpay specification generally denying each of its allegations, but the Board subsequently granted the Board's General Counsel's motion for summary judgment on all issues except the discriminatees' interim earnings. The Board directed a hearing limited to the determination of these earnings.

Prior to the hearing, which was scheduled for January 10, 1989 before an Administrative Law Judge ("ALJ"), the parties discussed the possibility of a voluntary settlement. The Union proposed a payment of $125,000 to be divided among the discriminatees in any way they and the Board Region saw fit. On the first day of the hearing, each of the four discriminatees stated his acceptance of the offer. The Union requested that

the ALJ direct acceptance of the settlement, but, after counsel for the General Counsel indicated that the settlement was not acceptable, the ALJ denied the Union's request. That night, the discriminatees reviewed the Union's financial position and concluded that it was stronger than they had realized. The next day, they withdrew their consent to the settlement. On January 25, the Board denied the Union's request for special permission to appeal the ALJ's refusal to approve the settlement.

The ALJ issued a supplemental decision on June 7, 1989, recommending that the discriminatees be awarded backpay as set forth in the Board's backpay specification of May 24, 1988 ($241,830.15), plus interest. On October 12, 1990 the Board issued its order upholding the ALJ's decision. The Union appeals the order on two grounds: first, that the ALJ and the Board erred in refusing to approve the settlement, and second, that the Union's backpay liability to the discriminatees should be reduced because the discriminatees did not make sufficient efforts to mitigate their damages.

## Standard of Review

■ We uphold decisions of the Board if its findings of fact are supported by substantial evidence and if it has correctly applied the law. *N.L.R.B. v. Howard Elec. Co.*, 873 F.2d 1287, 1290 (9th Cir.1989). Although we review questions of law de novo, we give considerable deference to the Board's expertise in construing and applying the labor laws. *N.L.R.B. v. Hydro Conduit Corp.*, 813 F.2d 1002, 1005 (9th Cir.1987).

## Discussion

1. *The Board's refusal to approve the settlement.*

■ The Board encourages the settlement of labor disputes. "The purpose of such attempted settlements has been to end labor disputes, and so far as possible to extinguish all the elements giving rise to them." *Wallace Corp. v. N.L.R.B.*, 323 U.S. 248, 253–54, 65 S.Ct. 238, 241, 89 L.Ed. 216 (1944). However, the Board has no statutory obligation to defer to private settlement agreements; it may defer in its discretion.

*Airport Parking Management v. N.L.R.B.*, 720 F.2d 610, 614 (9th Cir.1983). In exercising its discretion, the Board will refuse to be bound by any settlement that is at odds with the Act or the Board's policies. *Independent Stave Co., Inc.*, 287 N.L.R.B. 740, 741 (1987).

■ In evaluating a settlement to assess whether the purposes and policies underlying the Act would be effectuated by the Board's approving the agreement,

the Board will examine all the surrounding circumstances including, but not limited to, (1) whether the charging party(ies), the respondent(s), and any of the individual discriminatee(s) have agreed to be bound, and the position taken by the General Counsel regarding the settlement; (2) whether the settlement is reasonable in light of the nature of the violations alleged, the risks inherent in litigation, and the stage of the litigation; (3) whether there has been any fraud, coercion, or duress by any of the parties in reaching the settlement; and (4) whether the respondent has engaged in a history of violations of the Act or has breached previous settlement agreements resolving unfair labor practice disputes.

*Independent Stave*, 287 N.L.R.B. at 743; *American Pac. Concrete Pipe Co., Inc.*, 290 N.L.R.B. 623 (1988). We will apply these factors to the ALJ's decision not to accept the settlement.

The third and fourth factors weighed in favor of accepting the settlement. At the time the settlement agreement was reached, there was no evidence that the Union had a past history of violating the Act or breaching previous settlement agreements. The second factor was inconclusive. On the one hand, the settlement offer was less than half of the amount in the backpay specification, and the discriminatees' claim was strong. On the other hand, the hearings on this issue had not yet taken place, and "the risks inherent in litigation" might have gone against the discriminatees.

However, the first factor weighed strongly against the ALJ's approving the settlement. The General Counsel consistently and force-

fully opposed the settlement. Furthermore, the discriminatees promptly retracted their initial acceptance after discovering the Union's true financial position. The Union contends that because the ALJ should have accepted the settlement following the Union's motion to do so on the first day of the hearing, any proceedings that took place after the ALJ's refusal should not be considered by this court and are without legal effect. In other words, the discriminatees' withdrawal of their acceptance should not be counted as a factor in the *Independent Stave* equation; only their initial acceptance should be considered.

However, the discriminatees withdrew their acceptance before they had signed or formally executed any settlement agreement.[1] In his June 7, 1989 decision, the ALJ stated that "[the] circumstances of the 'settlement' so earnestly claimed by Respondent were in the nature of a continuum spanning both days of hearing." Thus, the discriminatees' initial verbal acceptance of the Union's offer was not determinative; the General Counsel's strong opposition to the settlement provided the ALJ with a ground to deny the Union's initial motion for acceptance, and the discriminatees then clearly and unequivocally rejected the Union's offer before the end of the "continuum." The discriminatees also gave a legitimate reason for the withdrawal: the evening of the first day of the hearing, they examined some Union financial statements, and concluded that the Union was in a far stronger financial position than it had represented during the settlement discussions.

Based on the discriminatees' and General Counsel's rejection of the settlement, and in light of the deference we accord the Board in construing and applying the labor laws, we hold that the Board correctly affirmed the ALJ's refusal to approve the settlement.

2. *The adequacy of the discriminatees' damage mitigation efforts.*

■ The purpose of awarding a discriminatee backpay is to restore him as nearly as possible to the situation he would have

been in but for the illegal discrimination. *Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). In a backpay proceeding, once the gross amount of backpay due a claimant is established, the burden shifts to the opposing party (in this case, the Union) to establish facts that would reduce that amount. *Kawasaki Motors Mfg. Corp. v. N.L.R.B.*, 850 F.2d 524, 527 (9th Cir.1988); *M Restaurants, Inc. v. N.L.R.B.*, 621 F.2d 336, 337 (9th Cir.1980). Any doubts must be resolved against the party who committed the unfair labor practice (again, the Union). *Kawasaki Motors*, 850 F.2d at 527.

One way to reduce backpay liability to a discriminatee is to show that he did not try to mitigate his losses during the backpay period by finding another job. If a discriminatee "willfully incur[s]" certain losses because of a "clearly unjustifiable refusal to take desirable new employment," the amount of these losses will be deducted from the backpay award. *Phelps Dodge*, 313 U.S. at 198–200, 61 S.Ct. at 854–55. *Kawasaki Motors* sets forth what a discriminatee must do in order not to incur "willful losses:"

> A wrongfully discharged employee is required to make only a reasonable effort to obtain interim employment, and is not held to the highest standard of diligence. Success or failure in securing interim employment is not a measure of the sufficiency of the employee's search; the law requires only an "honest good faith effort."

850 F.2d at 527 (citations omitted).

■ In this case, the Board affirmed the ALJ's factual finding that "each discriminatee made logical, appropriate and prudent efforts to mitigate the damages flowing from [the Union's] discrimination against them." We uphold findings of fact in a backpay proceeding as long as they are supported by substantial evidence, considering the record as a whole. *N.L.R.B. v. United Bhd. of Carpenters & Joiners, Local 1913*, 531 F.2d 424, 426 (9th Cir.1976). We review below the circumstances of each discriminatee to determine if the ALJ's findings were supported by substantial evidence.

---

1. Their rejection distinguishes this case from those such as *American Pac.*, where the discriminatee signed the agreement. 290 N.L.R.B. at 624.

We note as a preliminary matter that all four of these men were journeymen electricians who, prior to their backpay periods, did not hold down steady jobs at a single location but instead traveled around the country looking for work. They would travel to a location based on leads from friends or industry newsletters and register at local union hiring halls in the hopes of locating work, and were generally successful in doing so. This description of their work pattern is relevant to assessing the diligence of their efforts to find work.

■ We also reject the Union's argument that the discriminatees' backpay awards should be reduced because all four men failed to follow the proper procedures for obtaining work through Local 112, and thus missed numerous employment opportunities available to them through Local 112's hiring hall. We have already affirmed the Board's findings that the Union discriminated against the four men by not dispatching them to available jobs. *International Bhd. of Elec. Workers,* 827 F.2d at 532–33. Because it would have been futile for the discriminatees to search for work through standard Local 112 procedures, the discriminatees' noncompliance with such procedures does not constitute a failure to exercise due diligence. *See Iron Workers Local 118 v. N.L.R.B.,* 804 F.2d 1100, 1102–03 (9th Cir.1986) (union members' failure to pay disputed dues, which resulted in their not being dispatched on available jobs, does not constitute a failure to exercise reasonable diligence).

### a. Michael June

June's backpay period began April 1, 1982 and ended December 31, 1983. June remained in the Richland, Washington area until mid-June 1982. During that time, he registered at the local union hall and applied for jobs with contractors at the local nuclear power plant. He also traveled to Montana and registered at several hiring halls there, before returning to Richland and obtaining a "short call" involving less than 40 hours of work.

In mid-June 1982 he traveled to New York State because he did not feel there was a reasonable possibility of obtaining work through Local 112's hiring hall, given the perceived animus against him and the other discriminatees. He registered at seven local hiring halls in eastern New York and northern Pennsylvania. In the fall of 1983 he was referred to another short call in Erie, Pennsylvania. He then traveled through Colorado, Arizona, and Kansas to look for work, registering at local hiring halls and at employers such as the Arizona Public Service Commission. He remained unemployed until he found a job in April of 1983 with Computer Science in Buffalo, New York, where he worked until the end of his backpay period.

### b. Robert Knapp

■ Knapp's backpay period lasted from May 10, 1982 until February 1, 1984. During May and June, Knapp remained registered on the local union's books and sought jobs on his own and through the unemployment office.

At the end of June, he moved with his family to Dallas, Texas, because he had heard of job opportunities there through friends and through CUTE, a construction industry newsletter that contained information about job openings. He worked at the Sing–Oliver–O'Dwyer Electric Company for a little over a month, until he was laid off. He then traveled to Beaumont, Texas, where a brother lived; he signed the local union's books, went to the unemployment office, and looked around for other jobs. After three months in Beaumont he traveled to Palatka, Florida, in November, 1992, where he found a job. He was laid off about a month later, after which he repeated his typical job search steps: he registered at the local union, went to the unemployment office, and looked around for other jobs.

He returned to Kennewick, Washington in February 1983 for a Board hearing. Because he was "flat broke," he stayed in Kennewick until January 1984, when he got a job in Pendleton, Oregon. During the year 1983, he signed the Union's book and applied for numerous jobs, including several outside of the electrician's trade, such as postal carrier.

There is one additional complication in Knapp's case. Under Washington state law,

it is illegal for an employer to hire an individual who does not possess a license allowing him to perform work as a journeyman electrician. Wash.Rev.Code § 19.28.620. Knapp admittedly did not obtain such a license before or during his backpay period. The Union contends that his failure to apply for a license during his backpay period constitutes a failure to exercise reasonable diligence to obtain new employment, and thus the Union's backpay liability to him should be reduced accordingly. However, the Board found in the original liability litigation that Knapp had been dispatched by Local 112 to at least one job despite not being certified, and Thomas McKenzie, another discriminatee, had been dispatched repeatedly to jobs despite not being certified. *International Bhd. of Elec. Workers*, 827 F.2d at 533. Given this history, Knapp could have expected to find work despite not having a license, and thus his failure to obtain one should not weigh heavily against him.

### c. Thomas McKenzie

McKenzie's backpay period lasted from April 14 to May 25, 1982. During this time, he remained registered on Local 112's out-of-work list and registered with the Washington state unemployment office. He admitted that during the first few weeks of his backpay period he did a lot of odd jobs around his house, such as landscaping, carpentry, plumbing, and painting. He then traveled to three cities in Montana and four in California looking for work in different local unions, having heard there might be jobs in those locations. In each city, he signed the books at the hiring hall and asked around to see if there was work. He also stayed in touch with his wife to see if Local 112 had called with any jobs. He had no luck until the end of May, when he got a job in Los Angeles, which ended his backpay period.

Like Knapp, he never applied for a Washington state electrician's license; but this fact should be accorded little weight for the reasons stated above.

### d. Jimmy Scott

Scott's backpay period lasted from May 26, 1982 to December 31, 1983. He remained on Local 112's books throughout this period, and also signed the books at Wenatchee, Washington several times. He subscribed to two newsletters that listed electrician jobs across the country. He phoned local unions in several different cities to see if they had work. He also applied for jobs in other fields, such as sales, truck driving, taxi driving, and maintenance.

In October 1983 he traveled back to his parents' house in Columbia, South Carolina, and obtained short-term work in Augusta, Georgia. In December 1983 he got a job in New York City, which ended his backpay period.

### e. Summary and Discussion

Overall, the job search efforts of the four discriminatees appear very similar. They all remained registered at Local 112 and the local unemployment office. After trying to obtain jobs locally, they undertook to find jobs through means they had successfully used in the past: checking with friends and industry newsletters to find leads and then traveling to areas where job prospects seemed more promising. Three of the four men (June, Knapp, and Scott) obtained short-term jobs during their backpay periods. The ALJ noted that

> [even if their] efforts were less than urgent, spotty as to venturing outside their accustomed patterns, or unimaginative, these characteristics do not offset the essential sincerity of their search ... Overall there was a permeating earnestness to each discriminatee's efforts ...

We find that the discriminatees made an "honest good faith effort" to secure employment, and that the ALJ's findings were supported by substantial evidence.

### Conclusion

Because the Board General Counsel opposed the settlement and because the discriminatees promptly withdrew their initial acceptance, we affirm the Board's affirmance of the ALJ's refusal to accept the settlement. Because the discriminatees' job search efforts appear to have been reasonably diligent, we also affirm the Board's refusal to

reduce the backpay award for lack of mitigation efforts.

AFFIRMED.