Tauni SIMO; Dalores Rowe; Maria Ramirez; Petra Villegas; Petra Deleon; Candy Fernandez; Gabriela Uribe; Angelina Perez; Maria Clark; Lourdes Gonzalez; Vilma Garcia; Dolores Olivas; Maria Osorio; Silvie Madrigal; Ana Gonzales; Maria Aguirre; Mariana Godina; Lidia Peraza; Chong Suk Kim; Claristine Hadley; Yong Hui Pak; Teresa Gomez; Noemi Maya; Teresa Wilson Sloan; Miyako Kanai, Plaintiffs–Appellants,

v.

UNION OF NEEDLETRADES, INDUSTRIAL & TEXTILE EMPLOYEES, Southwest District Council; Union of Needletrades, Industrial & Textile Employees, AFL–CIO; Antonio Orea; Roxana Guevara, Defendants–Appellees.

No. 01–55937.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 2, 2002.

Filed Jan. 16, 2003.

Amended March 6, 2003.

Linda S. Klibanow, Pasadena, CA, for the plaintiffs-appellants.

Michael Rubin, Daniel T. Purtell, Victor M. Ortiz-de Montellano, Altshuler, Berzon, Nussbaum, Rubin & Demain, San Francisco, CA; Della Bahan, Bahan & Herold, Pasadena, CA, for defendant-appellee UNITE.

Laurence S. Zakson, Carlos R. Perez, Reich, Adell, Crost & Cvitan, Los Angeles, CA, for defendant-appellees .UNITE–SW, Antonio Orea, and Roxana Guevara.

Before: D.W. NELSON and T.G. NELSON, Circuit Judges, and SCHWARZER,* Senior District Judge.

## ORDER

The opinion filed January 16, 2003 [316 F.3d 974], is amended as follows:

Slip op. at 762, line 9 [316 F.3d at 979]: Replace the phrase "the union supporters" with "union officials and supporters"

Slip op. at 782, line 16 [316 F.3d at 990] : In the sentence beginning "We find that the workers have not presented," replace "evidence amounting to" with "evidence that a reasonable jury could conclude amounts to"

Slip op. at 783, line 11 [316 F.3d at 991]: Strike the paragraph beginning "Similarly, the union argues"

Slip op. at 788, line 1 [316 F.3d at 994]: Strike the clause "that she wouldn't get her health benefits" and the comma following the clause

Slip op. at 788, line 23 [316 F.3d at 993]: Before the sentence beginning "She also testified," insert "De Leon testified that, on one occasion, the union played loud music out of a van in the Sorrento parking lot."

Slip op. at 789, line 1 [316 F.3d at 994]: Insert "and" before the clause "that if they didn't support the union"; in line 2, strike the clause "and that her health insurance had been canceled because she signed the decertification petition" and the preceding semicolon

Slip op. at 789, line 4 [316 F.3d at 994]: Replace the phrase "She also testified that" with "She also testified that union officials mocked the workers by playing a song called 'Cardboard Houses' at the Sorrento factory, and that"

With these amendments to the Opinion, the panel has unanimously voted to deny appellants' petition for rehearing. Judge T.G. Nelson voted to deny the petition for rehearing en banc. Judges D.W. Nelson and Schwarzer recommended denial of the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. (Fed. R.App. P. 35.)

The petition for rehearing and the petition for rehearing en banc are DENIED.

## OPINION

D.W. NELSON, Senior Circuit Judge.

This suit arises out of a contentious labor struggle at a garment factory in San

---

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

Bernardino, California. Twenty-five garment workers ("the workers") brought suit against their union and its officials after the union engaged in secondary pressure to remove work from their factory. The workers alleged that their own union retaliated against them because they sought to have it decertified, in breach of the duty of fair representation ("DFR"), and that the union and the individual defendants initiated a campaign of harassment and intimidation constituting intentional infliction of emotional distress ("IIED"). In an unpublished order entered on April 23, 2001, the district court granted summary judgment on all claims, concluding that the workers had not produced evidence demonstrating the bad faith necessary for a DFR claim, nor evidence of outrageous conduct necessary for an IIED claim. We affirm the district court's ruling.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At all times relevant here, the Union of Needletrades, Industrial and Textile Employees Southwest District Council ("UNITE–SW") was the exclusive bargaining agent of the workers of Sorrento Coats, Inc. ("Sorrento"). UNITE–SW is an affiliate of the Union of Needletrades, Industrial and Textile Employees, AFL–CIO ("UNITE," and together with UNITE–SW, "the union"). Sorrento was part of an integrated production structure that included M. Shapiro & Co. ("Shapiro"), a jobber [1] that provided Sorrento with most of its work.

### A. The decertification petition and the removal of the Shapiro work

In May 1997, forty-two of the workers—a majority of the represented unit—signed a petition stating that they no longer wanted the union to represent them. On May 12 Sorrento told the union that it was withdrawing recognition and would not implement an extension of its collective bargaining agreement ("CBA") that had been agreed to earlier that year.

On May 14, 1997, the union requested that Shapiro, whose workers it represented and with whom it also had a CBA, stop sending work to Sorrento. Although there is some dispute as to whether it did so voluntarily, Shapiro complied, pulling its work from Sorrento. This secondary pressure is central to the claims in this case.

### B. The request for the Shapiro collective bargaining agreement

After Shapiro pulled its work from Sorrento, counsel for the workers made various requests and demands of the union, including demands to be provided with a copy of the union's collective bargaining agreement with Shapiro. Counsel originally made this request in a letter to UNITE SW dated June 27, 1997, and renewed the request in a letter to UNITE dated July 29, 1997. UNITE SW, through its counsel, denied the request in a letter dated July 9, 1997, stating that such documents would not be disclosed in the absence of a legal obligation to do so. UNITE never specifically responded to the request for the Shapiro CBA but replied to the letter in which the request was made on August 14, 1997.

### C. Proceedings before the National Labor Relations Board

On May 14, 1997, the union filed a charge with the National Labor Relations Board ("the Board") alleging unfair labor practices by Sorrento in violation of the National Labor Relations Act ("NLRA"),

---

1. In the garment industry, jobbers sell clothing to retailers and order it from the contractors and subcontractors who actually manufacture the clothing.

including unlawful withdrawal of recognition, refusal to bargain in good faith, refusal to execute the CBA extension, and making various statements to workers to encourage decertification of the union.[2] The union alleged that Sorrento management had sponsored the decertification effort. On November 6, 1997, the Board issued a complaint against Sorrento based on the union's charges.

On August 22, 1997, counsel for the workers filed a petition with the Board on behalf of two workers, appellants Tauni Simo and Maria Ramirez, seeking a decertification election for the Sorrento workers. On December 4, 1997, the Board's regional director dismissed the decertification petition, noting that the unfair labor practices alleged in the complaint against Sorrento tainted the evidence supporting the allegation that the workers no longer wanted the union (the "showing of interest").

On March 16, 1998, the union and Sorrento stipulated to a settlement of the Board's complaint, in which Sorrento would refrain from withdrawing recognition of the union, promising benefits to its workers if they rejected the union, or threatening its workers, and would begin bargaining with the union in good faith and implement the CBA extension. The Board approved the settlement in an order dated September 16, 1998.

### D. Alleged harassment by the union and union officials

The workers have presented evidence of a campaign of harassment by the union, its officials, and its supporters after the workers signed the decertification petition. Much of the harassment was attributed to Leovigilda Romero, a Sorrento employee and former UNITE–SW shop steward. Romero called the workers "stupid bitches" and said the union would kick their butts, told the plaintiffs in this action that they were stupid and would go to jail if they lost their suit, threatened the workers with deportation, and flipped her middle finger at one of the workers who started dancing when the union supporters were playing music at the Sorrento factory.

The workers also testified to harassing behavior by UNITE–SW officers Antonio Orea and Roxana Guevara. Both Orea and Guevara apparently told workers that they would lose their jobs due to their attempts to decertify the union. Orea told workers that they would "regret" signing the petition, that "the war has just begun," and that the union was going to battle. Several workers testified that Guevara told them they were stupid to sign the decertification petition and that, if they had been eating beans with the union, without the union, they would be eating shit. One worker testified that Guevara threatened to call immigration about the workers who did not have papers.

The workers' testimony established that representatives of the union, including Orea, visited workers at their homes to try to convince them to support the union. During these visits the union representatives made various threats that Sorrento would lose the Shapiro work and that the workers would lose their jobs and their health insurance. One worker testified that a union representative screamed her name from her front gate during a home visit.

The workers also testified that, one morning, flower arrangements and black ribbons appeared at the entrances to the

---

**2.** The union's charge was amended twice and a second charge, also amended, was filed later in 1997.

Sorrento factory. On another occasion, the union officials and supporters played music at the factory, including a song about poverty entitled "Cardboard Houses," to mock the other workers. Finally, the workers also testified as to their experiences during 1990, when union members apparently engaged in acts of violence during a strike at the Sorrento factory.

### E. The instant action

On January 30, 1998, the workers filed the instant action in California state court. The union immediately removed the lawsuit to federal district court. The complaint included a claim for breach of the duty of fair representation under federal labor law, which was based on the union's pressure on Shapiro to withdraw work from Sorrento, allegedly in retaliation for the workers' efforts to decertify the union, and on the union's refusal to give the Sorrento workers a copy of the Shapiro CBA. The complaint also stated four state law claims, including intentional infliction of emotional distress, over which the district court exercised supplemental jurisdiction. In the course of this litigation, the district court dismissed all state law claims other than IIED, finding that they were pre-empted by federal law.

After the lawsuit was filed, Sorrento and the union began bargaining again, pursuant to their settlement before the Board. The workers presented evidence demonstrating that, as a condition to approving a new CBA extension and allowing the return of the Shapiro work, the union demanded that Sorrento secure a dismissal of this lawsuit. The workers subsequently amended their complaint in this case to allege that the union's actions in attempting to have the lawsuit dismissed constituted an additional breach of the DFR.

On April 20, 2001, the district court granted the union's motion for summary judgment. The court found that the union was entitled to use secondary pressure against Sorrento, that the union had no obligation to give the Sorrento workers a copy of the Shapiro CBA, and that the union was entitled to attempt to obtain dismissal of a lawsuit that it believed to be employer-sponsored. Most importantly, the court found that plaintiffs had presented no evidence of bad faith or retaliatory motive on the part of the union necessary to substantiate a DFR claim. The court also found that the evidence presented did not reach the level of "outrageousness" required for an IIED claim and that several of the bases for the IIED claims were preempted by federal law.

The workers have appealed the grant of summary judgment as to their duty of fair representation and intentional infliction of emotional distress claims. They do not challenge the earlier dismissal of the other state law claims.

### II. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction over the federal law DFR claim pursuant to 28 U.S.C. § 1337(a). *See Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 83–84, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989). The district court properly exercised supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a). We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

We review the district court's grant of summary judgment de novo. *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether the district court correctly applied the relevant substantive law and whether there are any genuine

issues of material fact. *Id.* Summary judgment is improper if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We may affirm a grant of summary judgment on any ground supported by the record. *Keyser v. Sacramento City Unified Sch. Dist.,* 265 F.3d 741, 750 (9th Cir.2001).

## III. DISCUSSION

The union and the workers both make numerous legal arguments in favor of their respective positions. We address these arguments in the order we deem to be prudent and reach only those necessary to our disposition of this case. We conclude that the union is not liable for breach of the duty of fair representation, and that the workers have failed to produce evidence sufficient to maintain intentional infliction of emotional distress claims against any defendant.

### A. Proper parties to this appeal

In their opposition brief, the union pointed out that two of the appellants—Teresa Wilson Sloan and Miyako Kanai—were omitted from the Notice of Appeal. The workers subsequently moved to correct the Notice of Appeal, which was allowed by the Deputy Clerk. The union then filed a Motion to Reconsider Deputy Clerk's Order Granting Appellants' Motion to Correct Clerical Mistake in Appellants' Notice of Appeal, and the workers filed an opposition. This motion has been referred to this panel.

Federal Rules of Appellate Procedure 3(c) provides that "[a]n appeal must not be dismissed . . . for failure to name a party whose intent to appeal is otherwise clear from the notice." "If a court determines it is objectively clear that a party intended to appeal, there are neither administrative concerns nor fairness concerns that should prevent the appeal from going forward." Fed. R.App. P. 3(c) advisory committee's note. It is clear from the record that the omission of Wilson–Sloan and Kanai was an inadvertent clerical error stemming from their counsel's use of an incorrect caption; other pleadings before the district court (where the omitted plaintiffs clearly were parties) included the same incorrect caption. Furthermore, the workers' opening brief indicates that there are twenty-five appellants. Under such circumstances, it is objectively clear that the omitted workers intended to appeal; the Deputy Clerk properly allowed correction of the Notice of Appeal, and the motion for reconsideration is therefore denied.

### B. Duty of fair representation

The workers raise DFR claims based on three acts of the union: its allegedly retaliatory application of secondary pressure on Shapiro to pull its work from Sorrento, its refusal to provide the Shapiro CBA, and its demand that Sorrento secure dismissal of the workers' lawsuit. The union counters that all of these claims are barred because the lawsuit is employer-sponsored, that federal law immunizes secondary pressure in the garment industry from DFR liability, that it had no obligation to turn over the Shapiro CBA, that it was entitled to seek the dismissal of a lawsuit it believes to be employer-sponsored, and that several of the claims are barred by the statute of limitations.

█ The duty of fair representation owed by labor unions is not specifically articulated in any federal statute, but was created by the courts. With respect to unions recognized under the National Labor Relations Act, the DFR arises "from the grant under § 9(a) of the NLRA, 29

U.S.C. § 159(a) [ ], of the union's exclusive power to represent all employees in a particular bargaining unit." *Breininger,* 493 U.S. at 86–87, 110 S.Ct. 424. As the exclusive bargaining representative of the workers, the union has " 'a duty to exercise [its] power in their interest and behalf.' " *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 74, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (quoting *Steele v. Louisville & Nashville R.R. Co.,* 323 U.S. 192, 202, 65 S.Ct. 226, 89 L.Ed. 173 (1944)). "[A] union breaches its duty of fair representation if its actions are either 'arbitrary, discriminatory, or in bad faith.' " *Id.* at 67, 111 S.Ct. 1127(quoting *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)). "The duty of fair representation is thus akin to the duty owed by other fiduciaries to their beneficiaries." *Id.* at 74, 111 S.Ct. 1127.

We conclude that, although the workers' suit is not barred even if it is sponsored by Sorrento, the evidence does not show any violations of the duty of fair representation by the union. We therefore need not reach the question of whether the union's statute of limitations defense is viable.

*1. Employer-sponsored lawsuits*

█ The union asks this Court to find, based on allegedly uncontroverted evidence in the record, that this lawsuit has been sponsored by Sorrento and, therefore, the DFR claims must be dismissed. We need not reach the factual question of whether the undisputed evidence does in fact show employer sponsorship because we find that employer sponsorship does not bar DFR claims brought pursuant to the NLRA.

Section 101(a)(4) of the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(4), prohibits any "interested employer" from financing, encouraging, or participating in any action by a union member against her union. There is no question that Sorrento is "interested" in the instant action. *See Adamszewski v. Local Lodge 1487, Int'l Ass'n of Machinists,* 496 F.2d 777, 784 (7th Cir.1974) (holding that an employer is interested in litigation if it "is concerned with it or is liable to be affected by it or has some self-interest in it"). Thus, assuming that Sorrento has encouraged this lawsuit, the question is whether such sponsorship requires dismissal of DFR claims.

The Ninth Circuit has never directly considered a § 101(a)(4) violation, but the prevailing view in other jurisdictions is that such a violation requires dismissal of claims brought under the LMRDA. *See Harris v. Plasterers Local 406,* 619 F.2d 1164, 1170 (7th Cir.1980) (dismissing an LMRDA suit against a union because, among other reasons, it was "encouraged by an interested employer"); *Adamszewski,* 496 F.2d at 784–85; *Colapietro v. Int'l Ass'n of Machinists, Dist. 64,* 611 F.Supp. 90, 95–96 (D.R.I.1985) (holding that where employer financed an LMRDA suit, the court had "no alternative but to dismiss the complaint"). *But see Verville v. Int'l Ass'n of Machinists,* 520 F.2d 615, 622 (6th Cir.1975) (holding that § 101(a)(4) "is directed at employers" and does not "vitiat[e] a valid cause of action possessed by an employee"). The workers have not, however, asserted LMRDA claims, raising only duty of fair representation claims under the NLRA and state law claims. The union points to no authority, and we have found none, in support of the argument that a § 101(a)(4) violation requires dismissal of claims arising from the NLRA or any law other than the LMRDA.

In *Adamszewski,* one of the cases on which the union relies, the Seventh Circuit held that such a violation does not preclude litigants from "pursuing any other remedies" other than LMRDA claims.

496 F.2d at 784–85. The court relied on the savings provisions of two statutes for this conclusion. First, LMRDA § 103 notes that the LMRDA does not limit the rights or remedies available to union members under other federal laws. 29 U.S.C. § 413; *see also* 496 F.2d at 784 85. Second, LMRDA § 603 specifically provides that the LMRDA shall not be construed to "impair or otherwise affect the rights of any person under the National Labor Relations Act, as amended." 29 U.S.C. § 523(b).

We agree with the holding of *Adamszewski,* and find support for our position in a previous Ninth Circuit decision. In *Fechtelkotter v. Air Line Pilots Ass'n, International,* 693 F.2d 899 (9th Cir.1982), the panel considered a suit filed by Transamerica pilots against their union. The panel noted that, although they pursued claims under the Railway Labor Act and the Labor–Management Relations Act, "[t]he pilots have carefully avoided any attempt to invoke the LMRDA because Transamerica is supporting the litigation." *Id.* at 901. Although the panel ultimately dismissed the pilots' claims on other grounds, rendering any statements regarding LMRDA § 101(a)(4) dicta, we find no reason to depart from its views. We hold that, even if Sorrento is encouraging this lawsuit, such support would bar only claims brought under the LMRDA, not under the NLRA or state law.

### 2. The union's retaliatory application of secondary pressure

The workers' first claim for breach of DFR rests on allegations that the union pressured Shapiro to pull its work from Sorrento in retaliation for the workers' efforts to decertify the union. The workers argue that the union acted in bad faith, failed to consult the workers, concealed their actions from the workers, and used the secondary pressure to coerce them in the exercise of their right not to join a union. The union counters that its conduct is completely immunized by a proviso to NLRA § 8(e) protecting secondary pressure in the garment industry.

The district court found that the union's activity was not completely immunized from DFR liability, but also found that the workers had shown no evidence of bad faith. Although we agree with the district court that the garment industry proviso does not protect the union from DFR liability, we find that, because the union was not acting in a representative role when it pulled the work from Sorrento, the duty of fair representation does not attach to its actions. We therefore do not reach the question of whether the workers presented evidence sufficient to sustain their allegations of bad faith.

Under most circumstances, agreements between a union and an employer to boycott another employer are prohibited by NLRA § 8(e), 29 U.S.C. § 158(e). Mindful of the special structure of the clothing and apparel industry, however, Congress added two provisos applicable only to that industry. The first exempts the garment industry from § 8(e)'s prohibitions; the second goes farther, providing "[t]hat nothing in this sub-chapter [the NLRA] shall prohibit the enforcement of any agreement which is within the foregoing exception." 29 U.S.C. § 158(e). As the union concedes, there are no reported decisions construing the scope of the second proviso.

The union argues that the "plain language" of the proviso precludes all lawsuits arising under the NLRA, including DFR actions, based on secondary pressure in the garment industry. The union's interpretation is incorrect. The plain language of the proviso indicates that the NLRA cannot prohibit enforcement of a

secondary agreement in the garment industry. The workers do not claim that the union's *agreement* with Shapiro was unlawful; rather, they claim that the act of exerting external pressure on Sorrento in order to retaliate against the workers' rejection of the union violated the DFR. In other words, it is not the secondary pressure that the workers challenge, but the motivation behind it.

■ It is apparent from the legislative history that Congress never intended to immunize the union's actions against DFR claims. Instead, Congress was concerned that other parts of the NLRA—namely, § 8(b)(4) and § 8(e)—would prohibit agreements between unions and jobbers that prohibit the use of non-union contractors, which had long been used to organize the garment industry and eliminate sweatshop conditions. *See, e.g.,* Staff of Senate Committee on Labor and Public Welfare, Section by Section Analysis of the Labor–Management Reporting and Disclosure Act of 1959, at 20 (Comm. Print 1959), *reprinted in* 1 NLRB, Legislative History of the Labor Management Reporting and Disclosure Act of 1959, at 966 (1959) (hereinafter "LMRDA History") (noting that the proviso exempts the garment industry from secondary boycott prohibitions and "hot cargo" provisions).[3] There is no explicit mention of NLRA § 9 nor implicit reference to the DFR in the legislative history. We therefore conclude that the proviso is intended to exempt secondary

pressure in the garment industry from unfair labor practice liability—as indicated by the proviso's focus on prohibiting the enforcement of secondary agreements— but not to · immunize unions from DFR liability whenever such secondary pressure is applied.

Our conclusion that the union is not immune from DFR liability does not compel a finding that the union has, in fact, breached its duty. The Supreme Court's jurisprudence makes it clear that the DFR is implicated because a union is acting under authority granted by statute or a collective bargaining agreement. In *Breininger,* for example, the Court considered whether a union's operation of a hiring hall was subject to the DFR. 493 U.S. at 85–90, 110 S.Ct. 424. The Court rejected an argument that the union was not acting in a representative capacity, finding that

> [o]nly because of its status as a Board-certified bargaining representative and by virtue of the power ranted to it by the collective-bargaining agreement oes a union gain the ability to refer workers for employment through a hiring hall. Together with this authority comes the responsibility to exercise it in a nonarbitrary and nondiscriminatory fashion, because he members of the bargaining unit have entrusted he union with the task of representing them.

**3.** *See also* 105 Cong. Rec. 19771 (1959), *reprinted in* 2 LMRDA History 1857 (analysis by Sen. Goldwater, indicating that the garment industry proviso "provides an exemption from all of" the prohibitions of § 8(e) "and from all of the prohibitions in the secondary boycott provisions of section 8(b)(4)"); 105 Cong. Rec. 17327 (1959), *reprinted in* 2 LMRDA History 1377 (remarks of Sen. J.F. Kennedy, who drafted the garment industry proviso, noting that the Senate could not accept provisions of the House bill prohibiting secondary

boycotts unless "unions in the garment industry continue to have" the right to use secondary agreements); 105 Cong. Rec. 17381 (1959), *reprinted in* 2 LMRDA History 1385 (remarks of Sen. Javits, noting that the secondary boycott language in the original House bill "might wreck the whole structure of labor-management relations in the garment and clothing industries," and that therefore the bill must "explicitly exempt these traditional union-jobber agreements from secondary boycott prohibitions").

*Id.* at 87–88, 110 S.Ct. 424. In *O'Neill,* the Court found that contract negotiations were subject to the DFR, essentially holding that the DFR is implicated whenever the union "is acting in its representative role." 499 U.S. at 77, 111 S.Ct. 1127.

 Definitionally, however, the duty of fair representation does not apply where the union is not representing the workers in question. *See, e.g., Kolinske v. Lubbers,* 712 F.2d 471, 481 (D.C.Cir.1983) (" '[A] union ... can be held to represent employees *unfairly* only in regard to those matters as to which it represents them *at all.*' ") (emphasis in original); *see also Richardson v. United Steelworkers of Am.,* 864 F.2d 1162, 1166 (5th Cir.1989) (holding that the "duty of fair representation generally governs a union's conduct vis-a-vis the bargaining unit members *when the union is representing them*" (emphasis added)). This Circuit has held that a union owes no duty to union members who are not members of the bargaining unit that the union is representing. *Karo v. San Diego Symphony Orchestra Ass'n,* 762 F.2d 819, 821(9th Cir.1985).

Similarly, the Third Circuit, in a well-reasoned opinion analyzing *Breininger* and other Supreme Court precedent, found that "the duty of fair representation is inextricably linked to the union's status as exclusive bargaining representative in the collective bargaining process or in the administration of rights under a collective bargaining agreement." *Felice v. Sever,* 985 F.2d 1221, 1228 (3d Cir.1993). There, the court considered whether an applicant for a police job, who had been previously employed at a union job and retained his union membership, could maintain a DFR claim when the same union, which also

represented the police and had to approve funding for new hires, did not approve his application. *Id.* at 1223–24. The court held that he could not maintain a DFR claim because it was mere "happenstance" that he was a member of the union, and the union was not acting in a representative capacity. *Id.* at 1228–29.

 The same reasoning applies here. It is true that UNITE–SW continued to represent the Sorrento workers even after Sorrento repudiated the CBA extension and refused to bargain with the union, but the union was not acting in its representative capacity when it sought to deprive Sorrento of work. The union could have exerted the same pressure on Shapiro to pull its work even if the workers had been successful in their attempts to decertify the union, or if the union had never represented the workers. It was not acting pursuant to any authority granted by statute as the exclusive representative of the Sorrento workers; nor was it acting pursuant to authority granted by the Sorrento CBA.[4]

As the Third Circuit noted in *Felice,* "[t]he thread that links *Breininger* and other duty of fair representation cases ... is that the union is acting in its role as exclusive bargaining representative in the collective bargaining process." 985 F.2d at 1228. Here, the union was not doing so, and no DFR liability can attach.

Finally, the workers also argue that the union's failure to consult with the Sorrento workers before pulling the Shapiro work violated the duty of fair representation. As the district court noted, however, "[i]n light of the ... conclusion that the application of secondary pressure was not in itself

---

4. The parties dispute whether the union was acting under authority granted to it by the Shapiro CBA. Even if the union were doing so, however, it only would be under the duty to fairly represent the Shapiro workers in administering their CBA, not the Sorrento workers.

a violation of the DFR, it cannot be said that a failure to consult with employees who would be adversely affected by such pressure was a violation of the DFR." The union was not acting in its capacity as representative of the Sorrento workers when it agreed with Shapiro not to send more work to Sorrento, and was not obliged to consult members of each represented unit that might be affected by the agreement. *See White v. White Rose Food*, 237 F.3d 174, 183 (2d Cir.2001) (holding that where a union seeks ratification of an agreement by its members, it must consult them and explain the agreement to them, but where "such a ratification requirement is lacking ... the union has no duty to inform the members of the agreement"). We find no breach of the duty of fair representation arising from the union's application of secondary pressure on Sorrento.

3. *The union's refusal to disclose the Shapiro collective bargaining agreement*

█ The workers argue that the duty of fair representation requires a union to give its members access to any documents necessary for the members to assess the union's conformance with its duty, and that the workers therefore had the right to copies of any CBA entered into by the union that affected them. They argue that they had a specific right to the Shapiro CBA because the union relied on provisions of the CBA to pressure Shapiro to pull its work from Sorrento. The workers' argument attempts to meld caselaw arising under the duty of fair representation and the LMRDA, without actually asserting claims under the LMRDA.

In support of their position, the workers cite two duty of fair representation cases, *NLRB v. IBEW Local 112*, 827 F.2d 530 (9th Cir.1987) and *Anderson v. United Pa-*

*perworkers*, 641 F.2d 574 (8th Cir.1981). *IBEW Local 112* held that "[a] union's duty of fair representation requires it to permit hiring hall applicants to inspect dispatch records unless such inspection is shown to be 'burdensome' or the records contain 'truly confidential material.' " 827 F.2d at 533. *Anderson* held that a union may not misrepresent to union members the terms of their CBA. 641 F.2d at 577 & n. 2, 578. In both of these cases, however, the union's status as exclusive bargaining representative was implicated; in *IBEW Local 112*, the union gained its authority to operate a hiring hall only from a collective bargaining agreement, 827 F.2d at 532–33, and in *Anderson*, the union obviously was representing workers in entering into the CBA and thus had the responsibility to accurately explain its content. 641 F.2d at 576–78.

Neither of these cases supports the idea that union members have a right to any information from their union that may affect them, such as a CBA with a different employer, when the union is not acting as the exclusive bargaining representative of the workers. As noted above, a union can breach the DFR only if it is in fact representing the workers; here, the union was not representing the Sorrento workers when it negotiated, agreed to, enforced, or administered any portion of the Shapiro CBA. Because the refusal to provide the CBA to the Sorrento workers does not implicate the union's status as the workers' unique representative, it cannot violate the DFR.

The workers also cite three cases arising under LMRDA § 104, 29 U.S.C. § 414. *See Dole v. Local 427, Int'l Union of Elec., Radio and Machine Workers*, 760 F.Supp. 423, 428 (D.N.J.1991); *Colpo v. Gen. Teamsters Local Union 326*, 512 F.Supp. 1093, 1094–95 (D.Del.1981); *Forline v. Helpers Local No. 42*, 211 F.Supp. 315

(E.D.Pa.1962). Section 104 provides that a local union such as UNITE SW has the duty to "forward a copy of each collective bargaining agreement made by such [union] with any employer to any employee who requests such a copy and whose rights as such employee are directly affected by such agreement." 29 U.S.C. § 414. The cases cited by the workers support the idea that, under § 104, members of a local union are entitled to inspect all of the CBAs entered into by that union. *See Dole,* 760 F.Supp. at 428; *Colpo,* 512 F.Supp. at 1095. They do not, however, indicate that any violation of § 104 may be enforced through the duty of fair representation.

In determining whether to borrow the NLRA's statute of limitations for LMRDA claims, the Ninth Circuit has held that "[a] violation of section 104 by failing to give an employee a copy of the collective bargaining agreement is .... analogous to a union's violation of the duty of fair representation by failing to provide information to employees." *Gardner v. Int'l Tel. Employees Local No. 9,* 850 F.2d 518, 521–22 (9th Cir.1988) (footnote omitted). In *Gardner,* however, a union member had been unable to obtain a copy of his *own* collective bargaining agreement, not a CBA covering a different unit. *Id.* at 519. We have found no cases in which the duty of fair representation has been extended to the context here, where a union refuses to provide its members with a CBA covering a different bargaining unit.

Although the union may have had a legal obligation to provide the Shapiro CBA under LMRDA § 104, it had no obligation arising from its status as the workers' exclusive bargaining representative, and thus its violation of § 104, if any, would not constitute a breach of the DFR. To allow any violation of the LMRDA to be enforced through the DFR would eviscerate portions of the LMRDA itself, including the ban on employer-sponsored lawsuits discussed above.

### 4. The union's efforts to secure dismissal of the instant action

The workers have put forth evidence to show that, in its negotiations with Sorrento on a new collective bargaining agreement, the union demanded that the instant case be dismissed before it would allow the resumption of Shapiro work. They argue that this constitutes a breach of the duty of fair representation, effectively denying the workers of the right to sue their own union. The union argues, and the district court found, that there is no evidence of the union's bad faith in advancing this position, and that the union was simply attempting to secure dismissal of a lawsuit it believed to be employer-sponsored. We agree with the district court and find no breach of the DFR.

The duty of fair representation unquestionably attaches to contract negotiations by a union. In *O'Neill,* the Supreme Court held that a union violates the DFR if it acts arbitrarily, discriminatorily, or in bad faith, in the bargaining process. 499 U.S. at 67, 111 S.Ct. 1127. Unlike the decision to pull the Shapiro work, there is no question that, in its negotiations with Sorrento, the union was acting in its capacity as sole representative of the workers, and so the duty of fair representation is implicated.

In asserting that the union's conduct violated its duty, the workers do not indicate whether the union acted arbitrarily, discriminatorily, or in bad faith; instead, their argument relies on National Labor Relations Board decisions protecting union members' right of access to the Board. *See Local 45, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers,* 320 N.L.R.B. 1079 (1996); *Constr. & Gen. La-*

*borers, Local No. 304, Laborers' Int'l Union of N. Am.,* 265 N.L.R.B. 602 (1982). In each of these cases, the Board determined that the actions of the union violated NLRA § 8(b)(1)(A), 29 U.S.C. § 158(b)(1)(A), which provides that a union may not "restrain or coerce . . . employees in the exercise of rights guaranteed in [NLRA § 7]." *See Local 45,* 320 N.L.R.B. at 1081; *Constr. & Gen. Laborers,* 265 N.L.R.B. at 602. The rights guaranteed by § 7 include the right "to engage in . . . concerted activities for the purpose of . . . mutual aid or protection," 29 U.S.C. § 157, and these decisions hold that this language protects the employees' right to bring complaints before the Board. *See Local 45,* 320 N.L.R.B. at 1081; *Constr. & Gen. Laborers,* 265 N.L.R.B. at 602, 606–08.

 Contrary to the workers' assertions, however, neither of these cases is a DFR case.[5] Even if we were to conclude that the union's attempts to dismiss this suit violated § 8(b)(1)(A), such conclusion would not compel a finding of a breach of the DFR. "The duty of fair representation is not intended to mirror the contours of § 8(b)," *Breininger,* 493 U.S. at 86, 110 S.Ct. 424; our analysis must be governed by the scope of the DFR. Limiting our inquiry to whether the union violated § 8(b)(1)(A) would undermine the Supreme Court's emphasis on the jurisdictional differences between duty of fair representation claims, which are cognizable in the first instance in federal court, and other unfair labor practice claims, which must first be brought to the Board:

As we noted in *Beck,* "employees . . . may not circumvent the primary juris-

diction of the NLRB simply by casting statutory claims as violations of the union's duty of fair representation." 487 U.S., at 743, 108 S.Ct. 2641. When a plaintiff's only claim is that the union violated the NLRA, the plaintiff cannot avoid the jurisdiction of the NLRB by characterizing this alleged statutory violation as a breach of the duty of fair representation. To invoke federal jurisdiction when the claim is based in part on a violation of the NLRA, there must be something *more* than just a claim that the union violated the statute. The plaintiff must adduce facts suggesting that the union's violation of the statute was arbitrary, discriminatory, or in bad faith.

*Marquez v. Screen Actors Guild,* 525 U.S. 33, 49–50, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998) (quoting *Communications Workers v. Beck,* 487 U.S. 735, 743, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988)). We therefore turn to whether the union's actions here were in fact arbitrary, discriminatory, or in bad faith.

 "Whether a union acted arbitrarily, discriminatorily or in bad faith requires a separate analysis, because each of these requirements represents a distinct and separate obligation." *Thompson v. Aluminum Co. of Am.,* 276 F.3d 651, 657 (4th Cir.2002). Arbitrariness in the context of contract negotiations is governed by the standard articulated by the Supreme Court in *O'Neill:* "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' *Ford Motor Co. v. Huffman,* 345

5. In *Construction & General Laborers,* the Administrative Law Judge also had found a breach of the duty of fair representation, although this holding does not appear in his conclusions of law, and he did not specify whether he thought the union's actions were

arbitrary, discriminatory, or in bad faith. *See* 265 N.L.R.B. at 607–08, 610–11. The Board declined to reach the DFR issue, which apparently had not been raised by the complainant. *See id.* at 602, 604–05.

U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), as to be irrational." 499 U.S. at 67, 111 S.Ct. 1127. Under this standard, the fact that the union attempted to secure a dismissal of this lawsuit in the bargaining process is not *per se* unreasonable. The lawsuit was potentially very costly to the union, and it was not irrational for the union to attempt to limit these costs. Furthermore, the union has presented evidence that at least some of the workers were encouraged or recruited to join the lawsuit by Sorrento, potentially in violation of LMRDA § 101(a)(4). The union could have reasonably believed that it was in the best interests of the bargaining unit to seek dismissal of a lawsuit that was supported by the employer and that could be financially damaging.

It is true that, by seeking to dismiss the workers' lawsuit, the union was potentially favoring those members of the bargaining unit that had chosen not to sue the union. Nonetheless, "[a] union's reasoned decision to support the interests of one group of employees over the competing interests of another group does not constitute arbitrary conduct." *Spellacy v. Airline Pilots Ass'n–Int'l*, 156 F.3d 120, 129 (2d Cir. 1998).

■ "Whereas the arbitrariness analysis looks to the objective adequacy of the Union's conduct, the discrimination and bad faith analyses look to the subjective motivation of the Union officials." *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1243 (7th Cir.1997) (citation omitted). With respect to bad faith, we agree with the district court that the workers have failed to present any evidence that shows the union acted in bad faith. Although the workers strenuously argue that the union's unproven assertions of good faith should not be given credit, the structure of the duty of fair representation is that bad faith is required to show a breach; it is not

simply that good faith is a defense to liability. The burden is on the workers to produce evidence of bad faith. *See Stevens v. Moore Bus. Forms, Inc.*, 18 F.3d 1443, 1447(9th Cir.1994); *see also Vaca*, 386 U.S. at 210, 87 S.Ct. 903 (Black, J., dissenting) (noting that in a DFR claim, "the employee will have the additional burden of proving that the union acted arbitrarily or in bad faith"). The workers cite no evidence that could lead a reasonable jury to conclude that the union acted in bad faith when, during negotiations with Sorrento, it attempted to secure dismissal of this lawsuit. Indeed, the workers cite no evidence at all, arguing only that their own good-faith efforts to pursue intra-union remedies are inconsistent with the union's position that it believed the lawsuit to be employer-sponsored. This evidence is not sufficient to raise a triable issue as to whether the union acted in bad faith.

■ Whether the union's actions were discriminatory is a more difficult question. Quite obviously, the efforts to dismiss the lawsuit only affected those workers who had filed the lawsuit against the union, and thus the union could be said to be discriminating against those workers. On the other hand, there is no evidence that the union was motivated by any discriminatory intent based on any other characteristics of the workers who had brought the lawsuit.

The Supreme Court and our own published opinions give little guidance as to what constitutes discrimination in the duty of fair representation context. In *O'Neill*, the Court suggested that only "invidious" discrimination is prohibited by the DFR. 499 U.S. at 81, 111 S.Ct. 1127. The Tenth Circuit has explained that "discrimination is invidious if based upon impermissible or immutable classifications such as race or other constitutionally protected categories, or arises from prejudice or animus." *Con-*

*sidine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1359–60 (10th Cir.1994). We think that these grounds are too restrictive; we have held, for example, that a union may not "discriminate on the basis of union membership." *Bernard v. Air Line Pilots Ass'n, Int'l*, 873 F.2d 213, 216 (9th Cir.1989). Nonetheless, we find no evidence of discriminatory intent here. In its contract negotiations, the union did not seek to grant benefits to some members of the bargaining unit that it denied to others, nor did it treat similarly situated individuals differently. It did not seek to punish the workers who brought the lawsuit. Instead, the union's efforts to resolve the lawsuit necessarily only affected those workers who had brought the lawsuit, in the same way that a disciplinary policy necessarily affects only those workers with disciplinary violations.

We conclude that the district court did not err in dismissing the workers' claim that the union breached its duty of fair representation when, in the course of contract negotiations, it sought the dismissal of the instant action. The union's actions were not arbitrary, discriminatory, or in bad faith.[6]

## C. Intentional infliction of emotional distress

The workers claim that the union and the individual defendants Antonio Orea and Roxana Guevara (both officers of UNITE–SW) are liable for the state-law tort of intentional infliction of emotional distress. Ten of the appellants voluntarily dismissed their IIED claims with preju-

dice, so only the claims of the remaining fifteen are at issue.

The district court ruled that the workers' intentional infliction of emotional distress claims based on loss of work and loss of health benefits were preempted by federal law. The workers do not challenge these holdings in this appeal. The district court also found that the remaining allegations of IIED, mostly consisting of harassing and threatening conduct, including home visits by union officials, was not "outrageous" under California law.

The workers argue that the conduct of the union, Orea and Guevara was, in fact, outrageous. The union challenges that a number of the acts cited by the workers in support of their intentional infliction of emotional distress claims are either not attributable to the union or preempted by federal law.

## 1. Actions for which the appellees may be held liable

Before turning to the issue of whether the evidence presented by the workers is sufficient to meet the elements of intentional infliction of emotional distress, we first examine what evidence may be considered with respect to each appellee. This analysis includes whether each appellee may be liable for the acts of others, as well as whether certain types of conduct may be preempted by federal law.

The workers have not alleged or argued conspiracy or any other theory that would make the appellees generally liable for all of the allegedly outrageous acts. They have argued no theories that would allow

**6.** In holding that the union did not breach its duty by conditioning the resumption of Shapiro work on the dismissal of the instant action, we do not pass on the propriety of bargaining to impasse over such a condition. *See Swatts v. United Steelworkers*, 808 F.2d 1221, 1227 (7th Cir.1986) (noting that "bargaining to im-

passe in flagrant disregard of union members' interests might in some circumstances be both a breach of the duty of fair representation and an unfair labor practice"). In this case, the workers did not allege or argue that the union violated the duty of fair representation by unreasonably bargaining to impasse.

appellees Orea and Guevara to be held liable for anyone's actions but their own. Viewing the workers' pleadings charitably, they have argued that Orea and Guevara are agents of UNITE–SW, and that UNITE is liable for the actions of UNITE–SW. They also argue that the actions of former union steward Leovigilda Romero are attributable to the union.[7]

■ The union's liability for its purported agents is governed by Norris–La-Guardia Act § 6, 29 U.S.C. § 106. This section requires "clear proof" of participation, authorization, or ratification before a union can be held liable for the acts of its officers or members. *Id.* The workers' protestations to the contrary notwithstanding, the "clear proof" standard is applicable to this case. The Supreme Court held in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), that "[p]lainly, § 6 applies to federal court adjudications of state tort claims arising out of labor disputes." *Id.* at 737, 86 S.Ct. 1130. There can be no doubt that the conduct at issue here arose out of a labor dispute.

■ The union does not challenge the workers have raised triable issues of fact as to UNITE's liability for the conduct of UNITE–SW, and as to Orea's and Guevara's agency, but vigorously disputes the union's liability for Romero's actions. We

find that the workers have not presented evidence that a reasonable jury could conclude amounts to "clear proof" that the union authorized or ratified Romero's actions. At most, the evidence demonstrates only that Romero was a former shop steward who still maintained contact with union officials, including Guevara and Orea.[8] Thus, we will not consider Romero's acts in our analysis of intentional infliction of emotional distress.

■ The union also argues that it cannot be held liable for an incident in which unknown persons placed flowers and black ribbons at the entrances to the Sorrento factory, which some of the workers interpreted as a death threat or as evidence of witchcraft. The workers have presented no evidence that would allow a reasonable jury to find that Orea or Guevara was responsible for the placing of the flowers. Furthermore, even if circumstantial evidence might lead a jury to conclude that union supporters placed the flowers, there is no "clear proof" that the union authorized or ratified this act, and therefore it cannot be considered against the union either. *See* 29 U.S.C. § 106.

■ Finally, the union argues that consideration of the evidence of allegedly harassing home visits by union officials is pre-empted by federal labor law. Under *San Diego Building Trades Council v.*

---

7. The workers also suggest that the actions of union steward Carmen Garcia should be attributed to the union. Because they make no argument and present no evidence as to her agency, we will not consider her actions against the union.

8. The workers cite the following evidence in support of their argument that the union had given Romero authority to act: Guevara testified that, although not a shop steward, Romero provided her with information about Sorrento; Romero testified that the union representatives told her that Tauni Simo was the new shop steward; one worker said she

thought Romero worked for the union because she talked to the union representatives, wore a union t-shirt, and used to be a shop steward; Romero told two workers that she knew they were plaintiffs because she had gotten their names from the union; a worker identified her as a current shop steward, but gave no basis for this assertion; Romero taunted the plaintiffs; a worker testified that "it was rumored" that Romero was a union representative; Orea and Guevara gave the workers forms to fill out and told them they could return them to Romero.

*Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), actions regulated directly by the NLRA generally may not be regulated by state tort law. *Id.* at 243–45, 79 S.Ct. 773. "When it is clear … that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield." *Id.* at 244, 79 S.Ct. 773. The union cites cases that suggest that home visits are permitted by the NLRA and prohibited as an unfair labor practice if they are threatening or coercive. *See Randell Warehouse of Ariz., Inc.,* 328 N.L.R.B. 1034, 1037 (1999) (visits by union representatives "are unobjectionable so long as they are unaccompanied by threats or other coercive conduct"); *see also Lechmere, Inc. v. NLRB,* 502 U.S. 527, 540, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992) (implying that home visits are a perfectly acceptable means for the union to contact workers).

■ Although coercive home visits might constitute an unfair labor practice, "[t]he fact that a state tort may also constitute an unfair labor practice … does not inevitably cause preemption of the state claim." *Radcliffe v. Rainbow Constr. Co.,* 254 F.3d 772, 785 (9th Cir.2001). The Supreme Court has limited *Garmon*-preemption in the context of intentional infliction of emotional distress. In *Farmer v. United Brotherhood of Carpenters & Joiners,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the Court considered an employee's claims that his union harassed and intimidated him when he complained about the discriminatory operation of a hiring hall. Although noting that discrimination in the operation of a hiring hall is regulated by federal labor law, *id.* at 303 & n. 12, 97 S.Ct. 1056, the Court none-

theless allowed the employee's IIED claims to proceed under California law:

> [R]igid application of the Garmon doctrine might support the conclusion … [that the employee's] entire action was pre-empted by federal law. Our cases indicate, however, that inflexible application of the doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme. With respect to [the employee's] claims of intentional infliction of emotional distress, we cannot conclude that Congress intended exclusive jurisdiction to lie in the Board.
>
> No provision of the National Labor Relations Act protects the "outrageous conduct" complained of by [the employee].... Regardless of whether the operation of the hiring hall was lawful or unlawful under federal statutes, there is no federal protection for conduct on the part of union officers which is so outrageous that "no reasonable man in a civilized society should be expected to endure it."

*Id.* at 302, 97 S.Ct. 1056; *see also Radcliffe,* 254 F.3d at 785. We find the resolution of this issue squarely controlled by *Farmer,* and thus hold that the allegedly threatening and intimidating home visits may be considered against the union.

### 2. The elements of intentional infliction of emotional distress

■ The supplemental state claims of intentional infliction of emotional distress are governed by California law. Under California law,

> the elements of intentional infliction of emotional distress are:
>
> (1) extreme and outrageous conduct by the defendant with the intention of

causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by defendant's outrageous conduct.

*Christensen v. Superior Court,* 54 Cal.3d 868, [903,] 820 P.2d 181, 202 (1991) (in bank) (quotations and citations omitted). The conduct must not only be intentional and outrageous, but must also be "directed at plaintiff, or occur in the presence of a plaintiff of whom defendant is aware." *Id.*

*Sabow v. United States,* 93 F.3d 1445, 1454-55 (9th Cir.1996) (alteration in original). "Conduct is deemed outrageous if it is 'so extreme as to exceed all bounds of that usually tolerated in a civilized community.' " *Saridakis v. United Airlines,* 166 F.3d 1272, 1278 (9th Cir.1999).

We find that our analysis is simplified by addressing these required elements in reverse order. Although the parties failed to do so in their briefs, we find it necessary to consider the claims of each appellant individually. We conclude that none has presented evidence to demonstrate all of the elements of intentional infliction of emotional distress.

█ Seven appellants have not demonstrated severe emotional distress. "Severe emotional distress means emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." *Kiseskey v. Carpenters' Trust for So. Cal.,* 144 Cal.App.3d 222, 192 Cal. Rptr. 492, 497 (1983) (internal quotation marks omitted). Appellants Chong Suk Kim, Gabriela Uribe, Maria Osorio, Silvie Madrigal, and Lourdes Gonzalez each testified only that they felt threatened or scared by the union's conduct. Appellant Angelina Perez testified that she felt nervousness and tension, and was "emotionally hurt." Appellant Teresa Wilson–Sloan's testimony includes no references to any distress. None of these injuries rises to the level of severe emotional distress required by California law.

Causation is lacking for at least three other appellants. Maria Clark, Maria Aguirre, and Vilma Garcia each testified that her emotional distress was caused by her loss of work, lack of money, or both. Because claims for emotional distress based on loss of work were found to be preempted in the unchallenged holding of the district court, we will not consider such claims. These appellants did not testify that they suffered distress due to the harassing conduct of the union.

█ The remaining five appellants— Maria Ramirez, Tauni Simo, Petra de Leon, Mariana Godina, and Ana Gonzalez—all testified to severe emotional distress that a jury could reasonably find was caused by the union's alleged harassment. The remaining question is whether the conduct of the appellees was "outrageous" and could be found to be intended to cause emotional distress. In conducting this analysis, we note that none of the appellees could be held liable if UNITE–SW is not liable; UNITE's liability is derivative of UNITE SW's, and the actions of Orea and Guevara may be considered in determining UNITE–SW's liability.

Although outrageous conduct is defined by state law, the definition has federal implications. As noted above, the Supreme Court in *Farmer* found that federal labor law did not preempt IIED claims, but it noted that

[o]ur decision rests in part on our understanding that California law permits recovery only for emotional distress sustained as a result of 'outrageous' conduct. The potential for undue interfer-

ence with federal regulation would be intolerable if state tort recoveries could be based on the type of robust language and clash of strong personalities that may be commonplace in various labor contexts.

430 U.S. at 305–06, 97 S.Ct. 1056. Thus, the conduct complained of here must be more severe than ordinarily found in a labor dispute.

With certain pieces of evidence properly excluded pursuant to the discussion above, the evidence of outrageous conduct presented by each remaining appellant is as follows:

- Appellant Ramirez testified that Orea told her that she "was going to regret" her efforts to decertify the union, that both Orea and Guevara told her she would not have work anymore, and that Orea told the workers during a meeting that "the war has just begun." She also testified that union representatives visited her house three times, although she was only home the third time, when a union official told her that they would regret signing the decertification petition, and "not to be so stupid and believe the employer's promises."

- Appellant Simo testified that Guevara told the workers they were stupid for supporting the decertification petition, and that "without the union, we would be eating just plain shit." She also testified that Orea visited her home (which Orea also confirmed) and told her that if the employer "wanted war, he was going to have war" and that the union was going to go to battle; that the workers would be sorry for what they had done; that the union would block work from coming into Sorrento and the workers would end up without jobs; and that the union would try to come back by any means.

- Appellant de Leon testified that Guevara told her "that we're stupid and ignorant by not accepting the union because if … with the union we were eating beans, without the union we were going to eat shit[,] and that we were going to be sorry for that because they were going to take our jobs away." De Leon testified that, on one occasion, the union played loud music out of a van in the Sorrento parking lot. She also testified that union representatives visited her twice at home, and that one told her that if she didn't support the union, she would lose her job because Shapiro would pull the work; that the Sorrento factory would end up closing; and that the workers had to take the union back. When asked whether anyone from the union had harassed her, de Leon only mentioned the comments of Leovigilda Romero.

- Appellant Godina testified that Guevara told her that "with the union we at least were able to eat beans, but without the union we would be eating shit"; that the union had withdrawn the Shapiro work; and that if they didn't support the union, they wouldn't have any work. She also testified that union officials mocked the workers by playing a song called 'Cardboard Houses' at the Sorrento factory, and that de Leon had told her that the union had been violent during a strike in 1990.

- Appellant Ana Gonzalez testified that Guevara told her that she would call immigration about the people who didn't have papers; that they were going to be sorry; and that if they had been eating beans, they were going to eat shit. She also testified that union representatives visited her three times at her home, where she has a gate and

dog. The first time, a man yelled and screamed her name from the gate, and told her to sign the union card so that they would have work; the second time, a woman shouted and knocked on her fence; the third time she had been notified by a coworker that a union person would be coming, so she just ignored the visit.

As the district court found, this evidence simply is not sufficient to support an allegation of outrageousness. The most compelling testimony is Ana Gonzalez's statement that Guevara threatened to call immigration, but there is no evidence that she felt threatened and suffered emotional distress as a result of this comment.

The workers cite four cases to suggest that they have shown outrageous conduct, but all are irrelevant or easily distinguishable. *See Milne Employees Ass'n v. Sun Carriers, Inc.,* 960 F.2d 1401, 1412–13 (9th Cir.1992) (considering preemption but not reaching the substance of the IIED claim); *Accardi v. Superior Court,* 17 Cal.App.4th 341, 21 Cal.Rptr.2d 292 (1993) (same); *Kiseskey,* 192 Cal.Rptr. at 496 (finding that "threats of physical violence or death" were outrageous); *Kinnamon v. Staitman & Snyder,* 66 Cal.App.3d 893, 136 Cal. Rptr. 321, 323 (1977) (holding that lawyers' false and illegal threat to file criminal charges against a person who wrote a bad check would constitute outrageous conduct). These cases are not persuasive; rather, we find that the union's conduct here is exactly "the type of robust language and clash of strong personalities that may be commonplace in various labor contexts." *Farmer,* 430 U.S. at 306, 97 S.Ct. 1056. As such, it cannot form the basis of an intentional infliction of emotional distress claim.[9]

## D. The union's motion to strike

After the workers' opening brief before this Court was filed, the union filed a motion to strike the brief and the Excerpts of Record on the grounds that they were in violation of Ninth Circuit Rules 30–1.1, 30–1.4, and 30–1.5. The union also asked for a new briefing schedule so that the workers could file a new opening brief and Excerpts of Record.

Because this motion was referred to the merits panel rather than to a motions panel, its goals are now effectively moot. We do not condone the apparent violations of the rules of this Court; had we heard this motion at an earlier stage of this case, we very well might have granted it. Nonetheless, this case has been extensively briefed, and striking the workers' opening brief and Excerpts of Record now would serve no legitimate purpose.

## IV. CONCLUSION

The district court's grant of summary judgment as to all claims is AFFIRMED.

---

9. The union also argues that some of Orea's and Guevara's statements are protected speech under both the First Amendment and federal labor law. *See, e.g., Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 283, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) ("[F]ederal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point."). Because we find that these statements do not constitute outrageous conduct, we need not reach the issue of whether they might be protected.